**In re John A. KROH, Jr., George P. Kroh, Debtors.**

**KANSAS NATIONAL BANK & TRUST COMPANY, Plaintiff,**

v.

**John A. KROH, Jr., Defendant.**

**KANSAS NATIONAL BANK & TRUST COMPANY, Plaintiff,**

v.

**George P. KROH, Defendant.**

**Bankruptcy Nos. 87–00389–1–11, 87–00388–1–11.**

**Adv. Nos. 87–0184–1–11, 87–0185–1–11.**

United States Bankruptcy Court, W.D. Missouri.

June 16, 1988.

Amended Findings of Fact, Conclusions of Law and Judgment June 17, 1988.

Benjamin F. Mann and Douglas J. Schmidt, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, Mo., for Kansas Nat. Bank & Trust Co.

F. Stannard Lentz, Mission, Kan., for John Kroh.

Ronald S. Weiss, Kansas City, Mo., for George Kroh.

## ORDER GRANTING IN PART PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

KAREN M. SEE, Bankruptcy Judge.

Plaintiff Kansas National Bank & Trust Company seeks a determination that the debts of John A. Kroh and George P. Kroh are nondischargeable in bankruptcy pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(2)(B). The Bank also seeks to hold John liable for George's debt and requests punitive damages against both brothers as well, plus a determination that such awards would also be nondischargeable under

§ 523(a)(6). Pursuant to the Bank's unopposed pretrial motion, the cases were consolidated for trial. The Bank's motion for partial summary judgment, ruled orally prior to trial, is also considered herein. Jurisdiction is predicated on 28 U.S.C. § 157(b)(2)(B), (I). *In re Criswell*, 44 B.R. 95, 97[1] (Bankr.E.D.Va.1984) (complaint on a note and for fraud, seeking judgment which includes punitive damages and a declaration of nondischargeability is a claim against the estate and a core proceeding). This opinion, based on plaintiff's proposed findings and conclusions, constitutes findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. To the extent findings of fact should be considered conclusions of law or vice versa, they shall be so construed.

### *Plaintiff's Motion For Partial Summary Judgment*

Rule 56 F.R.C.P. applies in adversary proceedings. Bankr. Rule 7056. Summary judgment shall be entered when the factual presentation supporting the motion reveals no genuine issue of material fact and judgment may be entered as a matter of law. F.R.C.P. 56(c). The moving party has the initial burden of showing that no genuine issue as to any material fact exists. *Adickes v. S.H. Kress and Company*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608[12], 26 L.Ed.2d 142 (1970). Once that burden is met, the respondent has an affirmative duty "to set forth specific facts showing that there is a genuine issue for trial," and if the respondent fails to do so, "summary judgment, if appropriate, shall be entered against [him]." Rule 56(e). In lieu of entering summary judgment, the Court may determine those facts that are uncontroverted and those facts as to which trial will be necessary. Rule 56(d). Rule 56 does not mandate a hearing, and absent a request for a hearing none is required. *Benson v. Matthews*, 554 F.2d 860, 862[1] (8th Cir.1977) (per curiam). Although neither party requested a hearing both parties were given an opportunity to be heard during a pretrial conference and prior to trial.

The first question is whether plaintiff met its burden of showing no genuine issue of material fact exists. Plaintiff's motion was accompanied by 23 exhibits which plaintiff intended to present at trial; portions of two deposition transcripts, including one of a witness plaintiff intended to call at trial; portions of a transcript from a previous trial on a similar complaint involving debtor and another plaintiff; and six affidavits in the form required by Rule 56(e), five of which are from persons plaintiff intended to call at trial.

Debtors filed briefs in response but did not file any affidavits or other admissible evidence controverting any of the facts set forth in plaintiff's motion. Nor did debtors request further discovery or opportunity to obtain affidavits or other evidence as allowed under Rule 56(f). Thus, although debtors attacked the sufficiency of the evidence, they did so without providing any affidavits, depositions or other appropriate submissions pursuant to Rule 56.

■ George's primary argument centered on assertion of his Fifth Amendment rights.[1] He contends the assertion in his answer constituted a specific denial of each and every allegation therein. However, even when every allegation of a complaint has been denied, that alone is insufficient to meet respondent's burden of coming forward under Rule 56(e), which states:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is

---

1. As to each defendant, the Court may draw a negative inference from their assertions of Fifth Amendment rights against self-incrimination in these civil proceedings. *Pagel, Inc. v. SEC*, 803 F.2d 942, 946 (8th Cir.1986). However, as to John, the Court further notes that, contrary to assertions of his counsel, John has not consistently invoked his Fifth Amendment privileges. In this adversary he has filed an answer to the complaint and answers to interrogatories, and in the main file he filed schedules and statements of affairs. In all these items he answered fully without invocation of the Fifth Amendment.

a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

■ Under facts similar to this case, the court in *Chase Manhattan Bank v. Frenville*, 67 B.R. 858 (Bankr.D.N.J.1986) granted a motion for summary judgment under § 523. Further, George did not submit an affidavit invoking the Fifth Amendment as to the motion for summary judgment but instead requested that his brief in this matter, signed only by counsel, be considered such an affidavit. Under both *Frenville* and Rule 56(e), George's assertion of his Fifth Amendment rights, alone, is insufficient to either controvert any of the facts set forth in plaintiff's motion or prevent this Court from entering summary judgment if appropriate.

John's primary argument is that issues of fact remain. John does not dispute plaintiff's evidence that he wrote a letter stating the loan proceeds would be used in connection with the commercial portion of the Hall Farm project. He also does not dispute that the loan proceeds were put into the brothers' company, Kroh Brothers Development Company ("KBDC"). However, he contends the financial statement was not materially false as of August 15 because Mondschein's deposition testimony supports a much higher figure for shareholder equity in KBDC at that time.

■ Additionally, debtors argue that nondischargeability under §§ 523(a)(2)(A) and (a)(2)(B) must be established by clear and convincing evidence, which allegedly has not been done; that some of the affidavits were self-serving and offered only conclusory opinions, particularly as to the issue of the Bank's reliance on the alleged misrepresentations and false financial statements; that there is insufficient evidence of an agency relationship between George and John or of John's intent to deceive; and that certain depositions would not be admissible at trial.

Although it is the Court's conclusion that the Bank was entitled to summary judgment, the issues of intent, materiality,

agency, and the Bank's reliance were reserved for trial. Concerning the issues of credibility, with the exception of the affidavits of Catlett and Haseltine, the Court has either had the opportunity to hear the remaining affiants' testimony in other similar proceedings or has not been presented with any evidence controverting the facts stated in the affidavits. Catlett and Haseltine testified at trial so that the court could judge their credibility. Additionally, debtors consented to use of certain portions of relevant depositions at trial. For all these reasons, the Court finds that the Bank's factual submissions on summary judgment stand uncontroverted and therefore the evidence submitted in support of the motions is deemed admissible.

As to the standard of proof, it has recently been held in this district that "clear and convincing evidence" and "preponderance of the evidence" are actually varying terms for the same standard of proof under § 523. *Henson v. Garner*, 73 B.R. 26 (Bankr.W.D.Mo.1987), affirmed in unreported opinion, No. 87–0434–CV–W–1, (W.D. Mo. Feb. 29, 1988). In any event, assuming that "clear and convincing" evidence is a higher applicable standard, the Court finds the following facts have been shown by clear and convincing evidence in evidence presented for summary judgment. On October 20, John contacted Richard Catlett, president and chief executive officer of the Bank, to solicit personal loans of $250,000 each for himself and George. During his first conversation with John about the 1986 loans Catlett advised John the Bank could not loan him or George money if the money was going to be put into KBDC because the Bank had already loaned KBDC its legal limit. During this conversation John assured Catlett the loan proceeds would not be put into KBDC and that the loans were for personal investments in the Hall Farm Project. John also expressed an urgency in getting the loans, so on the basis of John's representations, Catlett orally presented the loan request to the Bank's Directors Discount Committee the morning of Tuesday, October 21.

The Committee approved the loans to John and George for the specific purpose of a personal investment in the Hall Farm Project if two conditions were met: first, that the Bank receive current financial statements adequate to support the loans from both John and George; and second, that the Bank receive written assurance that the loans were personal loans for investments in the Hall Farm Project.

Catlett then called John and advised him that before the Bank would make the loans it required current personal financial statements on him and George and a written assurance that the loans were for personal investments in the Hall Farm Project. During this second conversation Catlett told John, again, that the loan proceeds could not be put into KBDC and reminded him of previous problems with the bank examiners. John again assured Catlett the loan proceeds would not go into KBDC because the loans were for personal investments in the Hall Farm Project, and he promised Catlett he would send current personal financial statements for himself and George and the written assurance the Bank required.

The following morning, Wednesday, October 22, the personal financial statements of George and John were hand-delivered to Catlett. John signed his brother's financial statement "George P. Kroh by JAK." On the morning of Thursday, October 23, John called Haseltine and requested the proceeds of the loans. Haseltine advised John the loans could not be made until the Bank received the written assurance it requested. During the course of his conversation with John, Haseltine made it clear that under no circumstances could the proceeds of the loans be put into KBDC, not even for convenience. John again assured Haseltine the loans would not be put into KBDC and told him the loans were for personal investments in the Hall Farm Project. He further stated he would supply a letter to that effect. Later that same day John's letter was hand-delivered to Haseltine indicating the loans to him and George were for personal investments in the commercial portion of the Hall Farm Project.

The promissory notes were hand-delivered to KBDC's offices in Missouri. John and George executed the notes. A messenger returned the executed promissory notes to the Bank the next day, Friday, October 24. Upon receipt of the executed promissory notes, the Bank issued two bank money orders for $250,000 each, one payable to John and the other payable to George. The bank money orders were delivered to KBDC's offices that same day. George and John both received the money orders on October 24. Each deposited the proceeds into his personal account along with loan proceeds from two other "mirror" loans in which the brothers were loaned identical amounts by other lenders. Each then issued three checks payable to KBDC from their personal accounts in the amount of $250,000, which was the amount of the Kansas National Bank's mirror loans, and $200,000 and $500,000, which was the amount of two other mirror loans. The checks were all deposited into KBDC's account at United Missouri Bank on October 24, 1986. John does not contest the fact that the loan proceeds were placed in KBDC's accounts immediately after receipt by the brothers.

Although due demand has been made, no principal or interest has been paid on the promissory notes executed by George and John and delivered to the Bank on October 23, 1986. The notes are in default. The notes entitle the Bank to interest on the principal amount from the date of execution at a rate of 1% over prime. They also entitle the Bank to costs and reasonable attorneys fees if such expenses are incurred in the collection of the notes.

In seeking the loans for himself and George, John misrepresented his and George's financial condition to the Bank in writing by providing the financial statements to the Bank. Additionally, John misrepresented the use of the loan proceeds by stating that the proceeds were not going to be put into KBDC and that the loans were for personal investments in the commercial portion of the Hall Farm Project.

For the reasons and to the extent stated above, the Bank's motions for summary judgment are granted in part and denied in part.

### Findings of Fact

The following facts, which in part duplicate the facts established in the order for partial summary judgement, were established at trial by clear and convincing evidence.

John and his brother George were the principal shareholders and chief executive officers of KBDC during 1986. KBDC was a large real estate development company with a national reputation which has its headquarters in Kansas City, Missouri. Both brothers are intelligent, well educated business men who owned substantial interests in several banks. During 1986 George was a director of Commerce Bank, a major Kansas City bank.

Jacob Mondschein was the vice president of cash management and corporate accounting for KBDC for the first nine months of 1986 and had been employed by the company since 1971. Mondschein testified through his deposition and a portion of the transcript of his testimony in a prior trial, *Capital City v. George P. Kroh*, Adv. No. 87–0230–1–11. His testimony revealed that KBDC was having severe financial problems as early as 1985 and that he discussed those problems extensively with John and to a lesser extent with George throughout 1986. During these discussions Mondschein never retreated from his position that KBDC was in severe financial trouble primarily due to cash flow.

To overcome the cash flow problem George and John obtained a number of personal loans in 1986, funneling the proceeds of those loans into KBDC to pay ordinary company expenses. Although the brothers obtained personal loans in years prior to 1986, the frequency and number of the loans increased dramatically during 1986. Each of these personal loans to John and George were a set of mirror transactions. John and George would receive virtually identical amounts from the same bank, on the same days and under the same terms. The brothers received a report of their personal bank debt each month because it was a part of KBDC's cash flow reporting and cash flow reports were issued monthly. At one point John discussed his concern about the amount of his personal debt with Mondschein.

In addition to funnelling proceeds of personal loans into the company, George and John also employed a float check scheme to meet KBDC's enormous cash flow needs. Float checks were written on almost a daily basis throughout 1986 so that potentially overdrawn accounts never became insufficient funds accounts, although there were not sufficient funds on deposit in any KBDC checking account to cover the float checks. Float checks were signed by John, George and Mondschein.

Although Mondschein expressed concern about the float check policy and its legality, KBDC continued to issue float checks until mid-October. At that time, Commerce Bank, one of KBDC's banks, inquired about a large uncollected funds position in KBDC's account and contacted Mondschein. Shortly after his conversation with the bank, Mondschein called John and advised him they had been "caught." The following day, Saturday, October 18, Mondschein met with bank employees and lied to them about the cause of the uncollected funds position. Next Monday, October 20, Mondschein met with John, George and other top KBDC employees to discuss the bank's inquiry, the float check scheme and KBDC's financial condition. Immediately after the morning meeting on October 20, John and George met with Commerce Bank officers and obtained a $7 million loan for KBDC. Both John and George personally guaranteed the loan. Additionally, in September of 1986, Allen and Company advised KBDC there was little or no equity in its properties.

John contacted Richard Catlett, president and chief executive officer of plaintiff Kansas National Bank, to solicit personal loans of $250,000 each for himself and George on October 20, the same day the brothers guaranteed the $7 million loan from Commerce. John and George had a long stand-

ing relationship with the Bank and the Bank had dealt with John or other KBDC employees in arranging personal loans for George in the past. Also, George had previously expressed John's authority to obtain loans for him in several conversations with D. Eugene O'Connor, the Bank's past president. George had ratified all previous loan transactions arranged by John and other KBDC employees at the Bank. Additionally, John had arranged personal loans for George at other banks in the past and throughout 1986. George had ratified all the loans obtained on his behalf by John at other banks and never repudiated any such transactions.

Although Catlett had been with the Bank only three and one-half years, he was generally familiar with a problem the Bank had had with bank examiners regarding personal loans to John and George on a previous occasion. Therefore, in his first conversation with John about the 1986 loans, Catlett advised John the Bank could not loan him or George any money if the money was going to be put into KBDC because the Bank had already loaned KBDC its legal limit. During this conversation John assured Catlett the loan proceeds would not be put into KBDC and that the loans were for personal investments in the Hall Farm Project. Also during this conversation, John expressed an urgency in getting the loans, so on the basis of John's representations, Catlett orally presented the loan request to the Bank's Directors Discount Committee on the morning of Tuesday, October 21.

A quorum of the Committee was present at the meeting, and it was attended by two outside directors as well as Catlett and Ralph Haseltine. Haseltine is a senior vice-president at the Bank and has been employed by the Bank for 20 years. The Committee reviewed the personal loan files of John and George. These files contained the brothers' personal financial statements submitted in connection with previous loans. After discussion, the Committee approved the loans to John and George for the specific purpose of a personal investment in the Hall Farm Project on condition the Bank receive current financial state-

ments adequate to support the loans from both John and George and written assurance that the loans were personal loans for investments in the Hall Farm Project.

The purpose of the loans was important to the Bank because on one previous occasion bank examiners decided that personal loans to John and George should be considered loans to KBDC for the purpose of determining whether the Bank had exceeded its legal lending limit to KBDC. The bank examiners' previous determination meant the Bank had exceeded its legal lending limit to KBDC and the officers and directors of the Bank were subject to personal liability if the loans were not paid. Thus, the Bank required a written statement as to the purpose of the loans because it would not make a loan to John or George for an unspecified purpose or give them a line of credit to use as they desired without the bank examiners potentially concluding that the Bank had exceeded its legal lending limit to KBDC. John and George were aware of the previous problem with the bank examiners because the Bank advised them of it and asked them to pay the loans off immediately, which they did in the first part of 1984.

After the Directors Discount Committee meeting, Catlett called John and advised him that before the Bank would make the loans requested it required current personal financial statements on him and George and a written assurance that the loans were for personal investments in the Hall Farm Project. During this second conversation Catlett told John, again, that the loan proceeds could not be put into KBDC and reminded him of the previous problems with the bank examiners. John again assured Catlett that the loan proceeds would not go into KBDC because the loans were for personal investments in the Hall Farm Project and he promised Catlett that he would sent him current personal financial statements on himself and George and the written assurance the Bank required.

The following morning, Wednesday, October 22, the personal financial statements of George and John were hand-delivered to Catlett. George made his financial state-

ment available to John to be presented to Kansas National Bank and other banks for obtaining personal loans. The financial statements had been dated and signed as being current and accurate as of October 22, 1986, meaning no material changes in their financial situation occurred since the statements were prepared two months earlier on August 15, 1986. John signed his brother's financial statement "George P. Kroh by JAK." John had previously signed George's financial statements and George never complained about John signing such documents.

Catlett carefully reviewed the financial statements and determined they were adequate to support the loans requested and were wholly consistent with and not materially different from the previous statements the Bank had received from the brothers. After reviewing the financial statements, Catlett gave them to Haseltine who handled most of the Kroh loans in the past. Catlett told Haseltine to be sure the loans were not made until the Bank received the written assurance it requested. Haseltine also reviewed the financial statements and made the same determinations concerning their adequacy and similarity to previous statements. The Bank also ran a credit check on the brothers.

George and John had outstanding credit records at the Bank and there was nothing that indicated the Bank should expect anything to the contrary with the loans being requested. The Bank's internal policies did not require an independent investigation of the financial statements. The Bank satisfied its internal lending policies by determining that the loans were supported by adequate financial statements and were approved by the Committee. Moreover, Haseltine had discussed the brothers' personal financial statements with John in previous years and the Bank did a credit check on both John and George. There was nothing in anything examined by the Bank or in its past dealings with the Bank that indicated there would be any problems in extending credit to John and George for a personal real estate investment.

On the morning of Thursday, October 23, John called Haseltine and requested the proceeds of the loans. Haseltine advised John the loans could not be made until the Bank received the written assurance it requested. During the course of his conversation with John, Haseltine made it clear that under no circumstances could the proceeds of the loans be put into KBDC, not even for convenience. John again assured Haseltine that the loans would not be put into KBDC and told him the loans were for personal investments in the Hall Farm Project. He further stated he would supply a letter to that effect. Later that same day John's letter was hand-delivered to Haseltine indicating that the loans to him and George were for personal investments in the commercial portion of the Hall Farm Project. However, after requesting the loans and before the proceeds were disbursed, John specifically told Mondschein that the money from the Bank loans was to be put into KBDC, which was totally contrary to his representations to the Bank.

John's many assurances and his letter satisfied the Bank that the proceeds of the loans would not be put into KBDC and that the loans were for personal investments in the commercial portion of the Hall Farm Project. Accordingly, the promissory notes were hand-delivered to KBDC's offices in Missouri. John and George executed the Bank promissory notes (Exhs. 25, 26).

A messenger returned the executed promissory notes to the Bank the next day, Friday, October 24. Upon receipt of the executed notes, the Bank issued two bank money orders for $250,000 each, one payable to John and the other to George. The bank money orders were delivered to KBDC's offices that same day. George and John both received the money orders on October 24. Each deposited the proceeds into his personal account along with loan proceeds from two other mirror loans. Each then issued three checks payable to KBDC from their personal accounts in the amount of $250,000, which was the amount of Kansas National Bank's loans, and $200,000 and $500,000, the amount of the other two mirror loans. The checks were

all deposited into KBDC's account at United Missouri Bank on October 24, 1986.

Involuntary Chapter 7 petitions were filed against George and John on January 29, 1987. On February 13, 1987, KBDC filed a voluntary Chapter 11 bankruptcy petition. On February 25, 125 days after the Bank's loans to the brothers, John and George voluntarily converted the Chapter 7 petitions filed against them to Chapter 11 proceedings.

In seeking the loans for himself and George, John misrepresented his and George's financial condition to the Bank in writing by providing the financial statements to the Bank. The financial statements misrepresented the brothers' financial conditions in the following manner. First, the statements grossly overstated their net worth to be in excess of $19 million each. This was based in part on the valuation of their largest asset—their individual ownership interest in KBDC—at $14,250,000 each. In fact, KBDC filed bankruptcy less that four months later and the Schedules and Statement of Affairs indicate that the company was insolvent at the time. Moreover, both brothers knew of KBDC's severe financial problems throughout 1986. As the chief executive officers and insiders, they would also have been aware of Allen & Company's statement that there was little or no equity in the properties owned by KBDC. Second, the statements grossly understated their bank debt to be $3.3 million on October 22, 1986. In fact it was actually in excess of $11 million due in large part to the large number of personal loans the brothers obtained during 1986. Finally, the statements grossly understate the brothers' contingent liabilities. The statements indicate they had contingent liabilities of $321,000 on October 22, 1986. Actually they each had contingent liabilities in excess of $7 million because they had each guaranteed a $7 million loan on October 20. Thus, the financial statements were materially false, and at the time John presented them to the Bank he knew they were materially false.

Additionally, John misrepresented the use of the loan proceeds by stating a number of times that the loan proceeds were not going to be put into KBDC and that the loans were for personal investments in the commercial portion of the Hall Farm Project. John knew his representations concerning the use of the loan proceeds were false at the time they were made because he knew when he made the statement that the proceeds were going to be put into KBDC.

The Bank relied on John's misrepresentations concerning use of the proceeds and on the brothers' financial statements in making the loans. It is clear the Bank would not have made the loans to John and George if it had known their actual financial conditions. It is also clear the Bank would not have made the loans if it had known the proceeds were to be put into KBDC and the loans were not to be used for personal investments in the commercial potion of the Hall Farm Project.

Upon advice of counsel and pursuant to their Fifth Amendment rights, John and George refused to answer any questions at the trial of this case. Additionally, neither brother offered any evidence at trial.

 Since the trial in this proceeding, the Bank has requested this Court take judicial notice of the criminal proceedings in U.S. District Court for the Western District of Missouri involving both George and John, and has supplied the Court with the pertinent information. At a hearing on the issue of judicial notice, debtors were given an opportunity to be heard on the matter and were directed to file objections to the motion if they had any. None were filed. In fact, George Kroh's attorney stated on the record at the hearing that he had no objection to the taking of judicial notice of everything in the public court file in George's criminal case. Under these circumstances, judicial notice is mandatory. Rule 201(d) F.R.E. In *United States v. George P. Kroh*, Case No. 99–00072–01–CR–W–5 George entered a guilty plea on two counts of bank fraud under 18 U.S.C. § 1014. One of the counts involved the loan from Kansas National Bank which is the subject of this trial. George's guilty plea constitutes an admission of the facts

presented by the prosecuting attorney during the proceeding. Transcript of Plea, p. 17 (April 13, 1988). The transcript of proceedings held on April 13 in Case No. 99–00072–01–CR–W–5 indicates that George admits he made a materially false representation to the Bank in the form of a materially false financial statement in order to influence the Bank to lend him money. Additionally, the file in the case contains an unsworn statement indicating George's personal awareness of the financial situation at KBDC, the fact that his financial statement was false but he did nothing to prevent its use by John and the fact that the loan proceeds were used for KBDC and not for George's personal investment.

### Conclusions of Law

Congress established the fraud exception to discharge to discourage fraudulent conduct and to ensure that the relief intended for the honest debtor does not benefit the dishonest debtor. *Jennen v. Hunter*, 771 F.2d 1126, 1130[4] (8th Cir.1985). When dishonesty is demonstrated with respect to a specific debt, the debtor is not entitled to the "fresh start" debtor rehabilitation policy of the Bankruptcy Code. *Hunter*, 771 F.2d at 1130[3]; *Thul v. Ophaug*, 827 F.2d 340, 343 (8th Cir.1987). However, a creditor seeking a declaration of nondischargeability has the burden of proving each element by clear and convincing evidence. *Matter of Van Horne*, 823 F.2d 1285, 1287[1] (8th Cir.1987).[2] Based on the evidence adduced at trial and for the following reasons, judgment will be entered in favor of the Bank on all counts.

■ The Bank seeks nondischargeability of the brother's debts in the amount of $250,000 each under §§ 523(a)(2)(A) and (a)(2)(B). Additionally, the Bank seeks to hold John personally liable, as George's agent, for George's debt to the Bank and to have that liability declared nondischargeable. The Bank bases its latter claim on an alleged agency relationship between John and George that gave John the authority to

act for George. For the following reasons the Court concludes that John acted as George's agent with George's full knowledge and consent in obtaining the personal loan for him from the Bank and as George's agent, John engaged in tortious conduct in obtaining the loans and should, therefore, be personally liable for them.

■ A principal-agency relationship results from the manifestation of consent by the principal to the agent that the agent should act on his behalf. *Southern Pacific Transportation v. Continental Shippers Association*, 642 F.2d 236, 238[1] (8th Cir. 1981). George's plea of guilty constitutes an admission that he was responsible for the misrepresentations in the financial statement and, therefore, that John was authorized to make the representations on George's behalf. *See* Case No. 88–000–72–01–CR–W–5, Transcript of Proceedings, p. 17 (April 13, 1988). An agency relationship may also be shown by the relation of the parties to each other and their conduct with reference to the subject matter of a particular transaction as well as a previous course of dealing. *Weber v. Towner County*, 565 F.2d 1001, 1008[10] (8th Cir.1977), *accord Hamilton Hauling, Inc. v. GAF Corp.*, 719 S.W.2d 841, 848[8] (Mo.App. 1986).

The following evidence supports the Court's conclusion that a principal-agency relationship existed between George and John and that John acted within the scope of the agency in procuring the loans from the Bank. First, George previously made statements to Bank officers concerning John's authority to act on his behalf. Also, there was a prior course of dealing between John and the Bank in which John did act on George's behalf. Third, George signed the promissory note and did not repudiate the transaction. Fourth, George had never repudiated any previous loans obtained from the Bank by John on George's behalf. Further, when there is independent evidence that an agency relationship exists, the fact of a close familial

---

2. As noted earlier, there is persuasive authority that a preponderance of the evidence is actually the standard of proof. See *Henson v. Garner*, 73

B.R. 26 (Bankr.W.D.Mo.1987), affirmed in unreported opinion, No. 87–0434–CV–W–1 (W.D.Mo. Feb. 29, 1988).

relationship is entitled to considerable weight in tending to show an agency relationship. *Dinger v. Burnham*, 228 S.W.2d 696, 698[1] (Mo.1950); *see also Gottlieb v. LaBrunerie*, 514 S.W.2d 27, 32[7] (Mo.App. 1974). Finally, even if no actual or apparent authority existed, George ratified the transaction because he had knowledge of John's use of his false financial statement. *Dudley v. Dumont*, 526 S.W.2d 839, 847[28] (Mo.App.1975) (principal must know all material facts to ratify a transaction).

■ For these reasons, the Court concludes that an agency relationship existed between John and George. To the extent John's conduct in obtaining the loans was tortious he should be held personally liable for George's debt to the Bank. *Rochester Methodist Hospital v. Travelers Insurance Company*, 728 F.2d 1006, 1012[3] (8th Cir.1984) (an agent is subject to personal liability for tortious conduct even if he is acting within the scope of his authority). To the extent John's conduct was fraudulent, George should be held accountable for the conduct and the resulting debt to the Bank. *Rosebud Sioux Tribe v. A & P Steel, Inc.*, 733 F.2d 509, 571[9] (8th Cir. 1984) *cert den'd, A & P Steel v. Rosebud Sioux Tribe*, 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506; *accord, Tietjens v. General Motors Corp.*, 418 S.W.2d 75, 84 (Mo. 1967).

■ Turning to the question whether those debts are nondischargeable, under 11 U.S.C. § 523(a)(2)(A) a debt is nondischargeable if it represents credit obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." To be nondischargeable under this section the plaintiff must prove the following: debtor made representations; at the time debtor made the representations he knew they were false; the representations were made with the intention and purpose of deceiving the creditor; the creditor relied on the representations; and the creditor was damaged as the proximate result of the representations having been made. *Matter of Van Horne*, 823 F.2d 1285, 1287 (8th Cir.1987); *In re*

*Ophaug*, 827 F.2d 340 n. 1 (8th Cir.1987). Misrepresentations as to what the proceeds of a loan are to be used for will render a debt nondischargeable under § 523(a)(2)(A). *In re Pappas*, 661 F.2d 82, 86[2] (7th Cir. 1981); *accord Ophaug*, 827 F.2d at 341. Additionally, fraudulent intent may be shown by the circumstances surrounding the transaction. *Van Horne*, 823 F.2d at 1287[3].

Here, John's statements that neither his nor George's loan proceeds would be put into KBDC and that the proceeds would be used for personal investments in the commercial portion of the Hall Farm Project were material misrepresentations in view of the fact that the Bank could have and may have violated federal banking laws as a result of the loan proceeds being placed in KBDC. At the time John made the misrepresentations he knew they were false because he knew that KBDC was having severe financial problems. Also, John was aware that at least one bank had discovered the large uncollected funds in one of KBDC's bank accounts. Therefore, John knew that the proceeds from both loans would be put immediately into KBDC and would not be used for personal investments by either brother in the commercial portion of the Hall Farm Project. He even told Mondschein of his intent to do just that after the notes were executed and before the loan funds were received. He made the misrepresentations intentionally and for the purpose of deceiving the Bank in order to obtain credit for himself and his brother.

George, through John's acts, also made material misrepresentations concerning the use of the loan proceeds. He knew the Bank could not loan him money if it was to be put into KBDC because of the previous instance when he had to immediately pay off a loan from the Bank when bank examiners combined his loan with KBDC loans for the purpose of determining the Bank's legal lending limit. Because of the previous incident with the bank examiners, George knew that once the loan proceeds were deposited into KBDC the Bank would have potentially violated the law by exceed-

ing its legal lending limit. He knew, or at the very least, recklessly disregarded the fact that John was making fraudulent representations to obtain personal loans for him.

■ Further, the testimony of the Bank's officers clearly supports the Court's finding that the Bank relied on the misrepresentations made by John concerning use of the loan proceeds. The Bank was assured orally at least twice and in writing that the loan proceeds were to be used for the brothers' personal investment. Although reliance in this case was reasonable, it is not necessary to find that the reliance was reasonable under § 523(a)(2)(A). It is necessary only to find that there was, in fact, reliance, whether reasonable or unreasonable. *Ophaug*, 827 F.2d at 342–343[1] (8th Cir.1987). Finally, the element of proximate cause has been established. The Bank has been damaged in the amount of the unpaid balance on each note, the interest accrued on the notes, and the attorney's fees incurred. Absent John's misrepresentations the Bank would not have loaned the money to John and these damages would not have occurred. *See Van Horne*, 823 F.2d 1285, 1289, *quoting In re Maier*, 38 B.R. 231, 233 (Bankr.D.Minn.1984).

For all these reasons the Court holds that John and George made fraudulent misrepresentations concerning the use of the loan proceeds to obtain credit from the Bank for themselves. Accordingly, neither John's debt nor George's debt is dischargeable under 11 U.S.C. § 523(a)(2)(A). These same facts support a holding that John acted tortiously in procuring George's loan and should, therefore, be held personally liable for the debt incurred by George. For the same reasons previously stated, that liability is nondischargeable pursuant to § 523(a)(2)(A).

■ The Bank also seeks relief under 11 U.S.C. § 523(a)(2)(B). Under that section a debt is nondischargeable if obtained by a statement that is (1) materially false; (2) respecting the debtor's ... financial condition; (3) on which the creditor to whom the debtor is liable for such money,

property, services, or credit reasonably relied; and (4) that the debtor caused to be made or published with intent to deceive. Each of the elements of this section have been met.

First, a financial statement is materially false if it, as a whole, is found to be "a false representation of the overall financial condition of the debtor." *In re Mutschler*, 45 B.R. 482 491[6] (Bankr.N.D.1984). A financial statement with major omissions may also be considered as containing a materially false representation. *Id*. Also, financial statements that fail to list contingent liabilities are materially false. *In re Bebar*, 315 F.Supp. 841[8] (E.D.N.Y.1970). The financial statements of both John and George were materially false in all three of the above respects. The statements grossly overstated their net worth and grossly understated both their bank debt and their contingent liabilities as of October 21, 1988. The misrepresentations were fraudulent and produced financial statements that falsely represented the overall financial condition of the brothers.

Second, the Bank reasonably relied on the financial statements. When evaluating a creditor's reliance on financial statements, courts should be mindful of the danger of slipping into a review of the creditor's business judgment instead of focusing on whether it was reasonable for the creditor to rely on the debtor's misrepresentation. *McMillan v. Firestone*, 26 B.R. 706, 718 (Bankr.S.D.Fla.1982). Reasonable reliance comports with a bank's normal business practice. A bank should never be required to exceed its own internal policies before it will be deemed to have reasonably relied upon the financial statement of a debtor. *In re Esposito*, 44 B.R. 817, 825 (Bankr.S.D.N.Y.1984); *accord, Mutschler*, 45 B.R. at 493. When a creditor's reliance is at issue under § 523(a)(2)(B) the court should examine the following:

'[T]he creditor's standard practices in evaluating loan applications; industry standards; and particular circumstances existing when the financial statement is presented ... [Reasonableness] should

be viewed as a test of credibility. Reasonableness is not, with respect to the victim of an intentional tort, a framework of legal standards fashioned from an affirmative duty.'

*Matter of Earls*, 80 B.R. 978, 980 (W.D.Mo. 1987), *quoting In re Richards*, 71 B.R. 1017, 1022 (Bankr.D.Minn.1987). An independent investigation is not necessary. *Id.* Here, the Bank followed its internal lending policies and refused to lend the funds until it received the information it needed to approve or disapprove the loan. Two different bank officers made independent reviews of the financial statements and a credit check was made. There was no evidence that the banking community was aware of KBDC's financial situation at the time the loan was made. Both Haseltine and Catlett testified they would not have approved the loans had they known the true financial conditions of the brothers. Further, a bank may reasonably rely on the contents of a financial statement, especially "when the provider of the financial statement is a professional person." *In re Rodriguez*, 29 B.R. 537, 540[5] (Bankr.E.D.N.Y.1983). There is no question that John and George are men of intelligence and "professional persons" in the field of real estate development and finance. These facts show that the Bank reasonably relied on the financial statements in extending credit to the brothers.

Finally, it is abundantly clear that both John and George presented their financial statements with the intent to deceive the Bank. George's plea of guilty constitutes an admission of this fact. *See* Case No. 88–000–72–01–CR–W–5, Transcript of Proceedings, p. 17, 4/13/88; *Matter of Esposito*, 44 B.R. 817, 824 (Bankr.S.D.N.Y.1984) (a plea of guilty to 18 U.S.C. § 1014 establishes each element of 11 U.S.C. 523(a)(2)(B) except the requirement of reliance). As to John, because subjective intent to deceive is virtually incapable of direct proof, it must be inferred from all circumstances surrounding the transaction. *Mutschler*, 45 B.R. at 491. Additionally, when a debtor is an individual of intelligence and experience in financial matters, the mere fact that a financial statement is false and that

it is known to be false is sufficient to establish an intent to deceive. *Mutschler*, 45 B.R. at 491; *Rodriguez*, 29 B.R. at 541. Here, both brothers were aware of the financial condition of KBDC and the fact that they had just guaranteed a $7,000,000 loan. They were also aware of numerous other substantial personal bank loans John had procured for himself and his brother that were not listed on either financial statement. Further, John was told several times by Catlett that he had to provide current financial statements before the loans could be processed and thus was aware the Bank would rely on the statements. All these circumstances lead to the firm conclusion that John furnished the financial statements to the Bank with the intent to deceive the Bank, and that George, knowing of the personal loan and the false financial statement, did nothing to prevent the transaction and accepted the loan proceeds. For these reasons the Court holds that John's debt and George's debt to the Bank are nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B).

 Finally, the Bank seeks punitive damages of $2,500,000 against each of the brothers for their conduct in obtaining the loans and, if awarded, a determination that the punitive damages are nondischargeable under § 523(a)(6). While the Court disagrees with the amount requested, the principles on which the request is based are sound and particularly appropriate in this case. The situation here is extraordinary in respect to the grand scale of the scheme of fraudulent misrepresentations which resulted in losses of millions of dollars to a large number of lending institutions due to the brothers' concerted efforts and scheme to obtain a series of loans through fraudulent misrepresentations. Under Missouri law, a party is entitled to punitive damages when a defendant's conduct is willful, intentional and malicious. *Armstrong v. Republic Realty Mortgage Corp.*, 631 F.2d 1344, 1352 (8th Cir.1980). Punitive damages are awarded to punish a defendant for outrageous conduct and to deter similar conduct in the future. *Hillans v. Powell*, 773 F.2d 191, 198 (8th Cir.1985), *cert.*

*den'd,* 475 U.S. 1119, 106 S.C. 1635, 90 L.Ed.2d 181, (1986).

■ An award of punitive damages would not injure any other creditor in the bankruptcies because distribution is not made on a punitive damages claim until all unsecured creditors' claims have been paid. 11 U.S.C. § 726(A)(4). Punitive damages "are payable out of the estate's assets only if and to the extent that a surplus of assets would otherwise remain at the close of the case for distribution back to the debtor." 11 U.S.C. § 726(A)(4), Senate Report No. 95–989, 95th Cong.2d Sess. 96–97 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5882–5883. Congress approved punitive damage awards in bankruptcy proceedings when it changed the prior law which disallowed such claims entirely. 11 U.S.C. § 726, *note.*

■ Willful and malicious injury under 11 U.S.C. § 523(a)(6) is caused by deliberate and intentional acts that were wrongful and without just cause, but personal hatred, spite, or ill will is not required. *Perkins v. Scharffe,* 817 F.2d 392, 393 (6th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 156, 98 L.Ed.2d 112 (1987). See also *Barclays American/Business Credit, Inc. v. Long, (In Re Long),* 774 F.2d 875, 880 (8th Cir.1985), which requires the Court to find as two separate elements both willfullness and maliciousness. Willfullness is the intent to do the act, and a malicious injury is one which the defendant intended to harm the economic interest of the plaintiff or which the defendant knew was fully expected or substantially certain to harm the plaintiff's economic interest. *Long,* 774 F.2d at 880.

The acts of John and George were outrageous, intentional, willful and malicious as defined above. The acts resulting in injury to Kansas National Bank were intentional and were done with the intent to harm or the knowledge that the actions were virtually certain to harm the economic interests of Kansas National Bank (and many other lending institutions). Accordingly, Kansas National Bank is entitled to awards of punitive damages in the amount of $250,000 from each, which the Court has determined is an amount appropriate to punish the defendants' outrageous conduct and to deter similar conduct in the future. In making the award of punitive damages, the Court also notes the large number of loans John fraudulently obtained for himself and his brother by a deliberate and scheme to defraud lending institutions of millions of dollars, and the number of lending institutions injured by his actions, all as referenced in the evidence. Furthermore, it is clear that George knew what was occurring and, even though John actually made the contacts, George willingly participated in the scheme. For the reasons stated earlier in this opinion, it is clear George also acted with intent, willfulness and malice as defined herein. For reasons stated above, the judgments for punitive damages are nondischargeable under § 523(a)(6).

For the foregoing reasons, it is hereby

ORDERED ADJUDGED AND DECREED as follows:

1. On the promissory note executed by John A. Kroh, judgment is entered in favor of plaintiff and against defendant John A. Kroh, Jr. for $250,000, plus prejudgment interest and costs.

2. Judgment is entered in favor of plaintiff and against defendant John A. Kroh, Jr. for $250,000 as punitive damages.

3. On the promissory note executed by George P. Kroh, judgment is entered in favor of plaintiff and against defendants George P. Kroh and John A. Kroh, Jr. for $250,000, plus prejudgment interest and costs.

4. Judgment is entered in favor of plaintiff and against defendant George P. Kroh for $250,000 as punitive damages.

5. The judgments entered herein against defendants are declared nondischargeable in bankruptcy pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(2)(B), and (a)(6).

6. Plaintiff is directed to file, within five days, a statement of the prejudgment interest due, calculated at 1.0% per annum over Kansas National Bank's prime rate, as provided in the promissory notes, at which time an amended judgment will be entered.

## AMENDED FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

In the original Order, entered June 16, 1988, plaintiff was directed to submit a statement of prejudgment interest on the two promissory notes, whereupon the judgment would be amended. By telephone plaintiff's counsel has notified the Court and defendants' counsel of the interest calculations to be inserted in the judgment. Counsel has been directed to submit an affidavit setting forth the calculations in order to make the record complete.

The interest on each note was calculated, as provided in the notes, at one percent per annum over Kansas National Bank's prime rate from the date the notes were executed through June 16, 1988, the date judgment was entered. As to each note, the interest for that time is $38,866.43, with interest accruing at the rate of $68.49 per diem. Accordingly, the judgment is amended as follows. In all other respects the original Order, Findings of Fact, Conclusions of Law and Judgment entered on June 16, 1988, remain effective. Accordingly, it is hereby

ORDERED ADJUDGED AND DECREED as follows:

1. On the promissory note executed by John A. Kroh, judgment is entered in favor of plaintiff and against defendant John A. Kroh, Jr. for $250,000, plus prejudgment interest through June 16, 1988 of $38,-866.43, post-judgment interest as provided by law, and costs.

2. Judgment is entered in favor of plaintiff and against defendant John A. Kroh, Jr. for $250,000 as punitive damages.

3. On the promissory note executed by George P. Kroh, judgment is entered in favor of plaintiff and against defendants George P. Kroh and John A. Kroh, Jr. for $250,000, plus prejudgment interest through June 16, 1988 of $38,866.43, post-judgment interest as provided by law, and costs.

4. Judgment is entered in favor of plaintiff and against defendant George P. Kroh for $250,000 as punitive damages.

5. The judgments entered herein against defendants are declared nondischargeable in bankruptcy pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(2)(B), and (a)(6).